Bradley v HWA 1290 III LLC (2018 NY Slip Op 00516)





Bradley v HWA 1290 III LLC


2018 NY Slip Op 00516


Decided on January 30, 2018


Appellate Division, First Department



Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.


This opinion is uncorrected and subject to revision before publication in the Official Reports.



Decided on January 30, 2018

Renwick, J.P., Manzanet-Daniels, Andrias, Kern, Oing, JJ.


4964 157576/12

[*1]Marie Bradley, etc., et al., Plaintiffs-Respondents,
v
HWA 1290 III LLC, et al., Defendants-Appellants.


Kirkland & Ellis LLP, Washington, DC (H. Christopher Bartolomucci of the bar of the Commonwealth of Virginia and the District of Columbia, admitted pro hac vice, of counsel) for appellants.
Pollack, Pollack, Isaac & DeCicco, LLP, New York (Brian J. Isaac of counsel), for respondents.



Order, Supreme Court, New York County (Lucy Billings, J.), entered March 29, 2017, which, insofar as appealed from as limited by the briefs, denied defendants' motion for summary judgment dismissing the Labor Law § 200 and common-law negligence claims, reversed, on the law, without costs, and the motion granted. The Clerk is directed to enter judgment in favor of defendants dismissing the complaint.
This personal injury action arises out of the death of Edward Bradley (decedent), an experienced elevator maintenance mechanic, who was electrocuted as a result of coming into contact with a transformer while servicing a malfunction in one of the building's elevators. Decedent was working alone when he died; there is no evidence of how the accident occurred.
Defendant HWA 1290 III LLC (HWA) owns the building. Nonparty Schindler Elevator Corporation (Schindler), the building's elevator maintenance contractor, employed decedent as the building's resident or "stationary" elevator maintenance mechanic. Codefendant United Elevator Consultants Service, Inc. (United) is the elevator consultant retained by HWA to manage the building's elevator modernization project and its machine rooms and to monitor Schindler's performance under its elevator maintenance contract with HWA.
The accident occurred in the elevator motor room on the ninth floor where the elevator control cabinets and hoist motors are located. Decedent's body was discovered hours after his death in the motor room. He was found lying partially inside the bottom of the #3 elevator control cabinet with his body slumped over the metal plate covering the transformers. The medical examiner determined that he was the victim of an apparent accidental electrocution. Photographs of the control cabinet and the decedent, taken after his body was lifted out of the cabinet, depicted rags on top of the transformers. Additionally, screws and wire nuts were found on the floor beneath the transformers, which are located at the bottom of the control cabinet.
FDNY Captain Jeffrey Facinelli responded to the 9-1-1 call. At the scene, Facinelli observed decedent "face down on the floor" with one of his arms "reaching into the cabinet" and his "right arm and right side of his chest were lying on top of a transformer inside of the control panel."
Chief Elevator Inspector Douglas Smith from the New York City Department of Buildings (DOB) conducted a postaccident investigation. He testified that decedent was electrocuted when his right arm came into contact with the middle of the three transformers. With regard to how the accident might have happened, Smith's report surmised that "[i]t appears [decedent] was working at the bottom of the controller where the transformer was mounted and may have been reaching over and below the transformer when his arm and body made contact." Smith testified that "maybe [decedent] dropped something, was reaching for something," that there were many "possibilities," but that all were "speculation." Smith's report further provided that "[decedent] appears to have been performing maintenance on the #3 elevator controller in [*2]the 9th floor motor room" based on the fact that the #3 elevator's "fault log revealed a brake fault occurred at 1:30pm on 3/28/12, which appears to be the reason for the [decedent] trouble shooting the elevator's controller."
Plaintiffs commenced this wrongful death action alleging common law negligence and violations of the Labor Law. With regard to the common law negligence and Labor Law § 200 claims, plaintiffs alleged that defendants were liable based on the claim that the lighting in the motor room was not adequate, and that the transformer on which decedent was electrocuted did not have a cover.
Defendants moved for summary judgment dismissing the complaint. The motion court, as is relevant on this appeal, denied in part defendants' motion and allowed plaintiffs to pursue their common law negligence and Labor Law § 200 claims insofar as such claims were based on the alleged inadequate lighting in the motor room and the alleged lack of a cover over the transformers because "[d]efendants fail[ed] to demonstrate that the uncovered transformers and the lighting did not create dangerous conditions readily observable to defendants." We reverse.
Labor Law § 200 "codifies landowners' and general contractors' common-law duty to maintain a safe workplace" (Ross v Curtis-Palmer Hydro-Elec. Co., 81 NY2d 494, 505 [1993]). "Claims for personal injury under the statute and the common law fall into two broad categories: those arising from an alleged defect or dangerous condition existing on the premises and those arising from the manner in which the work was performed" (Cappabianca v Skanska USA Bldg. Inc., 99 AD3d 139, 144 [1st Dept 2012]). "Where ... the accident arises ... from a dangerous premises condition, a property owner is liable under Labor Law § 200 when the owner created the dangerous condition ... or when the owner failed to remedy a dangerous or defective condition of which he or she had actual or constructive notice" (Mendoza v Highpoint Assoc., IX, LLC, 83 AD3d 1, 9 [1st Dept 2011] [internal quotation marks omitted]).
With regard to the claimed inadequate lighting in the motor room, the dissent takes the position that a factual issue exists because "decedent was using a flashlight at the time of death" given that a flashlight was found near his body. Further, plaintiffs and the dissent rely on the testimony of Juan Melendez, a Schindler employee who, at one point in time prior to the accident, worked as decedent's helper. He testified that the fluorescent lighting in the ninth floor motor room "wasn't that good at all." In addition, Dennis Olson, plaintiffs' certified elevator inspector expert, states that "[p]oor lighting conditions would have created a safety hazard for [decedent] by impairing his ability to see his work area  including the uncovered transformers." We respectfully disagree with this position for the following reason.
Melendez's testimony is merely conclusory and fails to raise a factual issue as to whether the lighting in the motor room was up to code (see Cahill v Triborough Bridge & Tunnel Auth., 31 AD3d 347 [1st Dept 2006] [plaintiff failed to provide sufficient evidence to create an inference that the amount of lighting fell below the specific statutory standard by relying on conclusory and nonspecific assertions of witnesses stating that the area was "dark" or "a little dark"]; see also Carty v Port Auth. of N.Y. & N.J., 32 AD3d 732, 734 [1st Dept 2006], lv denied 8 NY3d 814 [2007] ["plaintiff's vague testimony that the lighting was poor' and the basement where he fell was dark' was insufficient to create an inference that the amount of lighting fell below the specific statutory standard'"]), particularly in view of the fact that Olson, other than merely stating the obvious, namely, that "poor" lighting "would" have created a safety hazard, critically, failed to opine that the lighting in the motor room was not code compliant. This failure is fatal to plaintiffs' claim given the testimony of Smith, who conducted the postaccident investigation, that the lighting in the motor room was up to code, and the absence from the record of any evidentiary proof of violations for inadequate lighting. Accordingly, defendants' motion for summary judgment dismissing the claims based on inadequate lighting should be granted.
Plaintiffs' Labor Law § 200 and common law negligence claims are based on the alleged dangerous condition of a lack of a cover over the transformers on which the decedent was electrocuted. Indeed, Melendez testified that there was a threat that a person could touch one of the transformers and be electrocuted because none of the transformers had covers. Thus, the issue to be resolved is whether defendants demonstrated that they did not cause or create, or have [*3]actual or constructive notice of, the allegedly dangerous condition, so as to warrant summary judgment in their favor. For the reasons that follow, resolution of this issue is not dependent on how the accident occurred, and, as such, a proximate cause analysis is not warranted. Further, with regard to the alleged dangerous condition, the absence of any witnesses is of no moment (see German v Morales, 24 AD3d 246, 247 [1st Dept 2005] [plaintiff decedent's expert raised an issue of fact as to whether defendant deviated from industry standards]; Detres v New York City Hous. Auth., 271 AD2d 309, 310 [1st Dept 2000] [plaintiff decedent proffered evidentiary and other materials to support the assertion that a dangerous condition existed]).
With regard to the issue of whether defendants caused or created a hazardous condition, there is no dispute that HWA and United did not design or manufacture the elevator control cabinet, or any of its electrical components, including the transformers, which was installed some time in 1997. HWA purchased the elevator system from nonparty O. Thompson Company, who designed and manufactured it during or prior to 1997. Plaintiffs proffer no challenge.
As to whether defendants had notice of the alleged dangerous condition, Richard B. Wallace, the building's property manager, testified that he was never informed that there was any problem with the elevator control cabinet or that the transformers lacked a proper cover either by the DOB or by United despite the fact that both DOB and United conducted inspections of the ninth floor motor room. Philip A. Garcia, United's president, testified that a cover was not required on the transformers because the transformers were in an enclosed cabinet. Further, Smith testified that if a transformer is in a cabinet, such as these transformers, the cabinet itself operates as the cover for the transformer, and that such a transformer does not have a separate cover over them. Additionally, Jon B. Halpern, defendants' licensed professional engineer expert, inspected the accident site, and provided the following opinion:
"Any suggestion that the building owners HWA 1290 and its elevator consultant United Elevator Consultants  neither of which had any experience in elevator component design  should have recognized the absence of a barrier over the transformers in the 1997 manufactured O'Thompson control cabinet as a hazard to the Schindler mechanic is unsupportable. ... It is the recognized custom in the elevator industry for the building owners and their elevator consultants to look to the New York City Department of Buildings ("NYCDOB") for concluding the safety of the design of elevator equipment in service in NYC. When this elevator was modernized in 1997 with the O'Thompson controller the NYCDOB approved the installation and found no problems with its design."
Indeed, Halpern noted that
"[f]ollowing [the] accident, ... the inspector who investigated [the] accident for the City did not issue a violation for the design of this controller  which would have carried a hazardous/cease use' directive  but rather opined in deposition that this control cabinet was safe because it had a closeable cabinet to protect non-professionals from the electrical hazards inside."
Finally, Halpern stated that "[t]he 1997 O'Thompson controller met all the applicable codes and standards," that it "was safe," and that further barriers separating the transformers from the other components were "not required under any applicable standards back in 1997 when the subject control cabinet was designed and manufactured."
Plaintiffs have failed to raise an issue of fact concerning actual or constructive notice. They have not proffered any evidence that any complaints were made to defendants by the decedent, Melendez, or anyone else that the lack of covers over the transformers was dangerous, or that defendants should have known that the absence of such a cover was dangerous and was in violation of a statute, ordinance or regulation. Nonetheless, plaintiffs and the dissent rely on Olson for the proposition that the lack of a cover over the transformer violated American National Standards Institute (ANSI) and is evidence that defendants had notice of the dangerous condition. For the following reasons, such reliance, respectfully, is misplaced.
Olson relies on ANSI A 17.5, Section 5.2, which states as follows:
"Barriers shall be installed to prevent contact with live parts if inadvertent contact with bare live parts during normal service and adjustment operation is considered probable. Note: Troubleshooting or the replacement of fuses is not considered a normal service adjustment operation with respect to control equipment, but the resetting of overload devices, repeated adjustment of timers or switches, etc., are considered normal service operations."
Olson's reliance on ANSI is not proper. To begin, the Environmental Testing Labs, an independent tester/certifier of products in the elevator industry, certified the elevator control cabinet as complying with the ANSI requirements. Even if the elevator control cabinet did not comply with the above ANSI standard because the transformers did not have a cover, plaintiffs have failed to establish that defendants were required by law to comply with the above ANSI standard. Indeed, the above ANSI standard has not been adopted by or incorporated into New York City's elevator code and ANSI itself is not a statute, ordinance or regulation. Thus, a violation thereof is not evidence of negligence (see Gonzalez v City of New York, 109 AD3d 510, 512 [2d Dept 2013] [ANSI standards do not constitute statutes, ordinances, or regulations and not proper evidentiarily in determining proper standard of care]).
The dissent also relies on Olson's statement that United "inspected the #3 control cabinet on numerous occasions in the 2 years prior to March 28, 2012 and thus knew, or should have known, that the transformers lacked this safety cover at that time" and his opinion that "with a reasonable degree of technical certainty, [] that if the transformer had a safety cover then [decedent] would not have been electrocuted."
Olson's statements are speculative and conclusory, and fail to raise an issue of fact as to defendants' actual or constructive notice of the alleged dangerous condition. Further, Olsen's opinion that had there been a cover on the transformer decedent would not have been electrocuted is pure speculation. Again, plaintiffs fail to point to any past complaints about the transformers, any time when the transformers or the cabinet did not pass inspection, or any industry-wide problems or issues with this type of cabinet and transformers that would provide actual or constructive notice of a dangerous condition.
Accordingly, the motion court should have granted defendants' motion to dismiss the claims related to the lack of a cover over the transformers.
All concur except Renwick, J.P. and Manzanet-Daniels, J. who dissent in part in a memorandum by Manzanet-Daniels, J. as follows:




MANZANET-DANIELS, J. (dissenting in part)


Plaintiffs' decedent was electrocuted while working in an elevator machine room on the ninth floor of a building owned by defendants. Though the exact cause of the accident is unknown, it is undisputed that decedent died as a result of being electrocuted via contact of his right arm with live transformers in an electrical cabinet.
The HWA 1290 defendants owned the building located at 1290 Avenue of the Americas. Decedent was an employee of nonparty Schindler Elevator Corp., the building's maintenance contractor. He was the building's resident mechanic for over five years preceding the fatal incident.
Defendant United Elevator Consultants Service, Inc. was hired by the HWA defendants as an elevator consultant to monitor Schindler's performance under its contracts with the building. The contract between the HWA defendants and United required United to provide one dedicated mechanic and one helper onsite during normal working hours.
On the afternoon of March 28, 2012, decedent was working in an electrical control [*4]cabinet located in the motor room on the ninth floor of the building [FN1]. Later that day, decedent was found dead from electrocution atop transformers that were located on the bottom right side of the cabinet. The medical examiner's report listed cause of death as "electrocution," and the manner of death as an "accident (right arm contacted electrical transformer)." He was not wearing safety gloves. Photos of the accident scene showed a handheld meter and handheld light next to decedent's body.
Douglas Smith, the chief inspector for the NYC Department of Buildings who conducted the post-accident investigation, concluded that decedent's accident occurred at 3:30 p.m., and that he was alone at the time of death.
The inspector testified that it appeared decedent had been reaching into the cabinet and that his right biceps made electrical contact with the transformer located on the lower right corner of the panel. The inspector agreed that a cover on the contact point would have prevented decedent from being electrocuted. He also agreed that a helper might be beneficial for tasks requiring an extra set of hands, including those where a helper might hold a drop light to better illuminate equipment. He also agreed that if a helper were present, he could have shut down the mainline switch in the motor room (located approximately 12-15 feet away), stopping the current and preventing decedent from being electrocuted.
Juan Melendez was decedent's helper for five years. He characterized the lighting in the ninth floor machine room as "poor." He testified that sometimes they had to use a "little flashlight" to peer inside the cabinet. The transformers inside the cabinet did not have covers.
Melendez was reassigned to an elevator modernization project shortly before decedent's accident. No one replaced him as decedent's helper; if decedent required the assistance of a helper, one of the workers on the project would assist. Since the modernization team worked from 7 to 3:30 p.m., decedent was alone during the 3:30 to 5 p.m. time frame.
Plaintiffs commenced this wrongful death action on or about January 17, 2014. Defendants moved for summary judgment dismissing the complaint, asserting that plaintiff was not engaged in "construction work" so as to impose liability under Section 241(6), and that the negligence claim could not be sustained because the cause of the accident was unknown. Defendants relied on the expert affidavit of John Halpern, a licensed professional engineer. Halpern opined that the 1997 O'Thompson electrical cabinet complied with manufacturing standards. He acknowledged that new cabinets installed as part of the modernization project had plexiglass barriers separating the transformers from the other components, but noted that "the components inside the new cabinet [we]re substantially closer to the transformers than in the 1997 O'Thompson cabinet." Halpern maintained that because decedent was engaged in "troubleshooting" at the time of his death, Section 5.2 of the Safety Code for Elevators did not apply.[FN2]
Plaintiffs opposed, asserting that defendants had failed to provide a helper for decedent though contractually obligated to do so, failed to provide adequate lighting, and created a hazardous condition by failing to provide a cover on the transformer which electrocuted the decedent. Plaintiffs relied on the affidavit of Dennis Olson, a certified elevator inspector. Mr. [*5]Olson opined that the photographs of the control cabinet where decedent was working at the time of death depicted exposed transformers with no safety covers. He opined that since United had inspected the control cabinet on numerous occasions in the two years prior to the accident, they knew, or should have known, that the transformers lacked a safety cover. He opined, in light of the findings of the medical examiner, and within a reasonable degree of technical certainty, that decedent would not have been electrocuted had the transformer had a safety cover. He noted that the Safety Code for Elevators (ASME/ANSI A 17.5, Section 5.2) required that "[b]arriers shall be installed to prevent contact with live parts if inadvertent contact with bare live parts during normal service and adjustment operation is considered probable." Mr. Olson further opined that while it was not possible to ascertain the exact task decedent was engaged in at the time of death, the absence of the helper placed him in danger if he were forced to perform a task alone that was generally reserved for two workers.
The motion court granted defendants' motion to the extent of dismissing the section 241(6) claim, and decedent's section 200 and common-law negligence claims to the extent predicated on the contractual duty to provide a helper, and otherwise denied the motion. I would affirm.
While "sheer speculation" as to the cause of an accident is not permissible (see Teplitskaya v 3096 Owners Corp., 289 AD2d 477 [2d Dept 2001]), proximate cause may nonetheless be demonstrated in the absence of direct evidence of causation and may be inferred from the facts and circumstances underlying the injury. To establish a prima facie case of negligence based on circumstantial evidence, "it is enough that plaintiff shows facts and conditions from which the negligence of the defendant and the causation of the accident by that negligence may be reasonably inferred" (Schneider v Kings Hwy. Hosp. Ctr., 67 NY2d 743 [1986]). Plaintiffs need not eliminate every other possible cause of the accident but defendant's negligence, as defendants suggest; rather, plaintiffs' proof must render those other causes sufficiently remote as to enable the jury to arrive at a verdict based not on speculation, but on logical inferences to be drawn from the evidence (id. [plaintiff established a prima facie case via proof that the side rails on the decedent's bed had been lowered, in violation of a hospital rule requiring that they be maintained in a raised position, from which it might be deduced that a staff person had lowered the bed rails, a more likely possibility than that the frail and elderly decedent had lowered the rails herself, particularly given the effort to activate a spring latch at the foot of the bed]; Maresca v Lake Motors, 25 NY2d 716 [1969] [for jury to determine whether the defendant's car, traveling in a parallel lane to the decedent, collided with the decedent's truck because the defendant crossed into the lane or because the decedent's truck veered into the defendant's car]; Davila v Sleepy's LLC, 142 AD3d 851 [1st Dept 2016] [circumstantial evidence in support of the plaintiffs' claim furnished a basis for jury to infer the defendants' liability for a bedbug infestation]; Hernandez v Alstom Transp., Inc., 130 AD3d 681, 683 [2d Dept 2015] [plaintiffs raised triable issues of fact as to whether the circumstantial proof rendered it more likely that an employee of defendant software company that maintained train's communication systems had placed a shoe paddle in the train door to prop it open than an employee of NYCTA]).
Plaintiffs have established a prima facie case via proof that the cause of decedent's death was electrocution; that the manner of death was an "accident (right arm contacted electrical transformer)"; that decedent was discovered next to the uncovered transformers with burn marks on the right side of the body, indicating that he was reaching into the cabinet at the time of death; that the lighting was inadequate; and that decedent lacked a required helper to perform his work. This evidence rendered it more likely than not that decedent was electrocuted due to defendants' failures to shield decedent from the transformers, rather than the remote possibility that decedent was electrocuted because he passed out or lost his balance or even that he failed to wear safety gloves [FN3]. This latter surmise is undercut by the fact that decedent was not found to have contact [*6]marks on his hands. Further, no evidence was offered that such "safety gloves" would have prevented decedent from being electrocuted.
On this record, plaintiffs raise issues of fact as to whether decedent died owing to the negligence of defendants. There is an issue of fact as to whether the lack of safety cover over the transformers constitutes negligence. Plaintiffs maintain that a cover was required as per ANSI § 5.2. However, the parties dispute whether decedent was engaged in "troubleshooting" at the time of death, such that the ANSI § 5.2 did not apply; and whether the ANSI standard required a "cover" other than the cabinet itself.
There is also an issue of fact regarding the adequacy of the lighting in the machine room. While the City inspector testified that the lighting in the machine room was up to code, he could not recall the minimum requirements for lighting under the code, and had no independent recollection of having performed a lighting test. The fact that decedent was using a flashlight at the time of death supports plaintiffs' assertion that the lighting was inadequate. Melendez was decedent's helper for five years and had occasion to observe the conditions in the motor room on a regular basis. He testified that they had to use "a little flashlight to look . . . inside the cabinet" because they could not "see otherwise." Both Melendez and Smith concurred that uncovered transformers could kill on contact, as happened here.
THIS CONSTITUTES THE DECISION AND ORDER
OF THE SUPREME COURT, APPELLATE DIVISION, FIRST DEPARTMENT.
ENTERED: JANUARY 30, 2018
CLERK



Footnotes

Footnote 1:According to witnesses, the computer associated with the elevator registered a "fault," shutting down the elevator. At the time of death, decedent was responding to the elevator.

Footnote 2:Section 5.2, cited by plaintiffs as evidence of negligence, has a caveat concerning the types of normal services and adjustment to which the section is applicable, specifying that "troubleshooting of the replacement of fuses is not considered normal service adjustment operation with respect to control equipment, but the resetting of overload devices, adjustment of timers or switches, etc., are considered normal service operation."

Footnote 3:This term was nowhere defined and I will not speculate as to what hazards any such gloves might or might not have protected against.